5-24-0336. Appellant, if you are ready to proceed, you may do so. Please identify yourself for the record. Thank you. Good morning, Your Honor. My name is Tom Crosby. I represent Q.E.D. Medical Physics, Inc., the defendant below, the appellant herein. And this case comes to this court in the no locatory appeal by permission based on the grant of summary judgment to SIH on a complaint for restitution filed in Jackson County. In this case, SIH, Southern Illinois Hospital Services, seeks to shift the loss it suffered as a result of years of embezzlement by one of its employees using his position as an employee of SIH. They want to shift that loss to Q.E.D. Medical Physics. There's many problems with that, and the biggest one is to try and convert an independent criminal action by one of your employees into either a contract or some form of restitution action. And as you've seen in my briefs, there's many legal defenses that have been postured which would prevent that. I have a question, Mr. Crosby. Now, this cross pollution for summary judgment, there was a hearing, is that right, on the cross pollution? Yes, Your Honor. Was there a transcript of that hearing? I do not believe so. I'm not aware. The record was 1,500 pages long. I don't recall seeing it. There were findings. I know Judge Soberson made an order, but I was wondering about the transcript of that hearing. Okay. Well, another question I had is the money that was overpaid, your client, has that ever been paid back? Has it ever been paid back? The money that was overpaid, the margin that was not paid from my client to Mosley, the embezzler, was offered to be paid back. There was an agreement between SIH and QED once the problem was discovered. And voluntarily, before any attorneys were involved, him working, who was the sole owner and president of QED, went to Mark Nostad, the CEO of SIH, and said that he never authorized Mosley to work there. He had SIH. He knew that that was immoral. And he offered to pay to SIH that portion of money that QED benefited, in other words, the amount that they retained after paying Mosley his ill-earned hourly charges. So how much was offered to be paid? Excuse me? How much was offered to be paid? The amount that was agreed to be paid, I believe, was $378,000 in that area. And that represented the amount that QED retained after paying Mosley. for a period of time that was established by SIH, by John Daly, based on numbers presented by John Daly, the corporate counsel. They agreed to pay for that. And they were working on a deal, and it looked like it was done. And then they pulled the plug on the deal. They fired them. And I think, Judge, that answers your question, but it gets to one of the claims, a very unusual claim in this case, that is barred by the voluntary payment doctrine, as are all the other restitutionary claims. And that's a claim of vicarious liability for the fraud of someone else. And the court below granted judgment on that for two reasons. One, they found that there was a judicial admission that Mosley, the embezzling employee, was acting as the agent of QED during the period of his embezzlement. There is no judicial admission to that fact. As a matter of fact, there are specific denials and affidavits to that effect, and no contrary evidence. The other thing that was relied upon by the court was a statement that throughout the period of time of this litigation, that QED never repaid the $1.2 million, the total amount of the fraud, that SIH's employee was responsible for. And the court used that as a basis for saying you didn't relinquish the benefit you got from this fraud. But the reason they didn't relinquish the benefit from the fraud was that SIH refused to share responsibility for its filings. But more than that, and what's important as far as the whole vicarious fraud, is that there has, in order to even get close to that, there has to be a showing that Mosley was acting during the six and a half years of his embezzlement as QED's agent. There is no evidence to that, none. Now the SIH suggests that, well, his agency can be shown by implication that he held himself out as an agent. But there's no evidence to that. As a matter of fact, the evidence is just opposite. SIH complains, we never knew that QED was working, had Mosley working in other hospitals in Tennessee and Kentucky as a dosimetrist. We never knew that fact. They never knew that Mosley had any connection with QED, so how can they say that there's some kind of holding out of an apparent authority? There's not. There's no evidence of that. So that whole cause of action. Excuse me? Under the concept of apparent authority, wouldn't that have to be something that was known?  I mean, that's the whole idea. That's the whole idea. It's apparent. Exactly, and then we see it in the professional medical negligence, you know, that someone has to be held himself out. Here, it's just the opposite. SIH claims we didn't know that he had any connection to QED, so where's the apparent authority? More than that, as far as just the agency, Kim Wilking said, we never assigned him, nor would I ever have assigned him to work as a dosimetrist at SIH. That is undisputed, and that fact is borne out very easily by the contract and how it was performed. So if I could just move into what I think that the death throw for this cause of action for all the restitutionary claims is the voluntary payment doctrine. And the voluntary payment doctrine is a recognized ancient law, and the Supreme Court in Illinois, particularly in the McIntosh case, has defined that as a, here it goes, the Supreme Court said that the common law voluntary payment doctrine embodies the ancient and universally recognized rule that money voluntarily paid under a claim of right to the payment and with the knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal. And that's in McIntosh, and it's also in the Smith case. And that's in line with the restatement third concerning unjust enrichment, in which the rules typically stated money voluntary paid with knowledge of facts cannot be recovered back. So in this case, does the voluntary payment doctrine apply? If it does, it bars all of the claims. And we know that because also in McIntosh, the court stated that, well, first of all, let me, the court stated in McIntosh that the fraud exception and the mistake of fact exception to the voluntary payment doctrine hinges on what information was given to as a demand for payment. In this case, it's the invoice and what was called the statement of fees. And this is a very large record, over 1,500 pages, and I don't know whether the court has had the opportunity. I've shown counsel, but I would like to present an exemplar from the record of the invoices so that you can see them while I discuss them if that's fine to the court. The invoice. Have you shown it to counsel? Yes, I have. Thank you. The contract also was specific in requiring that in addition to the invoice, that QED would have to provide a detailed statement of fees. So attached to that e-mail was the invoice. This is from the month of March in 2008. And Mosley, the embezzler, name, if you look at the statement of fees that accompanied the invoice, Mosley's name from his false time entries were attached to that. Now, if anyone had looked at the statement of fees, they would realize that Mosley was charging his employer as if he was an independent contractor, and they would have stopped it. But more than that, this is very important. The allegation by SIH is that there was a breach of this contract when QED sent any invoice or any statement of fees for over 24 hours a week because there's a limitation in the contract that all of the physics services could be completed in 24 hours unless there were specific exceptions. So their case is based on paying for more than the contract required, 24 hours a week. Well, Mosley, having worked for QED in Tennessee and Kentucky at other hospitals knew that it was a two-person operation. Kim Working was the president. He was a physicist. He's a clinician. And Mr. Working had put together a consortium of other physicists to go to hospitals to support their oncology radiation departments. What they do is they aim the linear accelerators and calibrate them so that when they shoot the tumors, they can destroy the tumors and not the healthy tissue around them. The dosimetrists are the people in the hospital who aim the linear accelerators. The physicists, like Mr. Working and those other physicists who work for him, go from hospital to hospital as they're required to by law and calibrate their linear accelerators. And they also work with their oncologists to develop treatment plans. And Kim Working and his associated physicists had done that at SIH with incredible success from 2001 until 2014 when Mr. Mosley's fraud was discovered. He's a clinician. He helps stop and treat cancers. So what happened here, he has a two-man operation, himself and a part-time bookkeeper. And the reason he's able to build these various hospitals is he has an online secure system called JORNEX where if a physicist goes to the Baptist Hospital in Paducah and he does some work, he types into the program, this information that's on this statement of fees. And it tells what was done, who did it, what was done, and why. And it also tells the number of service hours. So if you look at that statement of fees for that March 2008, there's a line that there's 237.25 service hours being charged for that month at $125 a month. Well, Mosley got promoted at SIH and became the head of the Department of Radiation Oncology. So he received the bills from QED. He knew that there was no communication between working and his part-time bookkeeper who simply went to the secure system and ran off the statement of fees for each hospital and then created an invoice that summarized the fees that were being charged. So what did Mosley do? First, and in 2008 he did this, if you look, his name appears there on the statement of fees. And it should, obviously, because he can't do physics work. He's a dosimetrist. He's not a scientist. So they know that. And to avoid being discovered for several years until 2011, this started in 2007, his fault, he would wipe out, he'd copy them, he'd wipe out his name, put in the name of another physicist who worked for QED, and then he would send the invoice and the statement of fees to accounts payable to be paid. And they'd pay him. But then he discovered, as time went by, that he didn't even have to, even though the contract had required it. In 2011, he just started to destroy the email statement of fees and not send those to accounts payable. And accounts payable did nothing, despite the fact that contract requires that it be paid on the statement of fees, and their custom and practice had been for 10 years to pay on the basis of the statement of fees. What he did instead was send the invoice. Now, that's enough to trigger the voluntary payment document. If you look at the invoice, you'll see that the first line, there's two oncology centers, one in Mary and one in Harvard. They're divided out there on the description. So, I guess, 215 hours at $125 an hour, and then the contract also provides for the travel time as being the professional hours. So, did they know that they were being charged more than the contract provided, 24 hours per week? Yes. How? Well, if you take the... I'll give you time to sum up your... Oh, I'm sorry. That's okay. If you take the simple math, 31 days in March, you divide that by 7, you know how many weeks there are. There's 4.42 weeks. You divide the amount of service time on the invoice, 237 hours, by 4.42, you come up with 53.67 hours per week. So, everything that's needed to determine whether or not they were more than 24 hours was contained on the invoices, which were never destroyed. So, the Voluntary Payment Doctrine applies because the Supreme Court has said that where the demand for payment is accurate and states the nature and amount of the charge, there can be no bar to the VP, the Voluntary Payment Doctrine, by either fraud or mistake of fact. Thank you for letting me finish up. I have one question. Yes, Judge. I want to read to you a sentence from Judge Salverson's order. Right. Chief Financial Officer Mike Kasler, QED, never returned any of the fraudulent EFD funds to SIH. As QED repaid the financial benefit from Mosley's fraud, QED cannot, six years later, disavow knowledge of the fraud. For these reasons, Mosley's knowledge is attributable to QED, but not to SIH. Could I respond to that? Explain to me in a couple of sentences why that is not correct. One, it doesn't apply to vicarious fraud because there's no agency between QED and Mosley. Wally was the employee of SIH. No agency. Therefore, that clause of action doesn't exist. Two, the fraud was discovered by QED after they fired Mosley for credit card fraud. They came to SIH, explained it, and offered to pay them the amount of money that they retained. They worked on that deal, and then SIH walked away from it, and a year later sued them for the entire amount of the loss. So it's not as if we are – that QED is claiming they didn't know there was fraud. They knew there was fraud. They tried to ameliorate any benefit that they had based on numbers they were given by SIH. And SIH decided, let's go for the deep pocket and get all of the money from QED. Okay, thank you. I believe you may proceed. Please identify yourself for the record. I'm sorry, I'm a little bit hard of hearing. Please identify yourself for the record. Good afternoon. I am Lyndon Wilms from – representing Southern Illinois Health Care System. They're the plaintiff's affiliate in this case. I want to address a couple of things that were brought up in the prior arguments, and those go to these actual statements. As described, Mr. Mosley would get these, go back and correct the back pages, and charge SIH for physicist's time. Not his time, but physicist's time. So the breach was that he's in essence charging for his time, and he's not a physicist. I want to talk about the voluntary pay doctrine that was brought up. As counsel discussed in McIntosh, when payment's made under the right of claim, and there's knowledge of the facts by the person making that payment, they can't go back, call back, or ask for those funds back due until legal. Now, there are exceptions to this, but let's start first with knowledge. For actual knowledge for SIH, they had no actual knowledge of this fraud until they fired Mr. Mosley for his credit card charges. And how did they find out about the fraud? Bills from QED suddenly dropped. Once those dropped, they contacted QED and asked for an account, and this is where the genesis of this learning about the fraud took place. There's no constructive knowledge to SIH based on – your agent knows and conveys to you and communicates to their principal all the information. Now, you can overcome that by imputing the knowledge, but you overcome that knowledge by looking if there's imputed knowledge. When a corporate officer engages – and this is from McGrath – in conduct that's so outrageous, they're lining their own pockets to the detriment of their employer, there's no constructive knowledge. There is imputed knowledge onto QED because they're the ones benefiting from this. They also retained the benefits of the funds that were paid, $1.2 million. If you look at how much – in the U.S. versus Mosley, Mosley received $593,905. He made a claim he caught in essence of the net of just over $300,000. So over $600,000 was sitting with QED. In the negotiations to attempt to potentially solve this issue between QED and SIH, QED offered about $378 million – excuse me, $600,000 to solve this. That would not make SIH whole even if you just account for what QED received. So trying to negotiate that was not really in good faith. Also, when we look at the difference between SIH and QED, SIH had an officer who had left his – in essence his obligation to SIH and pitched his car – pitched towards their cart by QED. So he was operating for QED throughout all of this. So by fraud, by what he did to line his own pockets, voluntary repayment documents should not apply in this case. I'd like to – I think you asked a question about – let me find it here – about the – about Mr. Mosley's place in QED. If you look at the contract, paragraph number 34 talks about the relationship between the two corporations and really tries to identify that any of the agents from SIH and any of the agents from QED are operating as independent contractors from each other. And so the assumption is when you have that kind of situation, anybody who's operating on behalf of QED, be it an agent, a principal, an employee, even though he's classified as an independent contractor, he was still operating on behalf of QED. He is an agent of QED. Now, the – you talk about vicarious liability. As far as vicarious liability is concerned, we have some of the same principles. We have to look at who the actors and what they are doing. So the actors here is SIH is the first part – is the party. Let me try this here. I'm sorry. We look at – we look at the kind of employee, who's the employee, and what they were doing, whether operating within their normal duties. Now, for SIH, during this fraud, he was – Mr. Mosley was not operating for SIH. He was operating for QED. Did he conduct this at the same time and place he would do for disemployment for QED? Yes. He was using the Jernick system, their system, to input all this false information. And so is the employee motivated by partially or wholly for the purpose of serving the employee? Well, yes. He was an employee. He was working as an in-built contractor already in Tennessee and Kentucky. And now he has his – and that's his excuse. He's laying a golden egg that he can exploit the Jernick system. He knows how QED operates. It's a very efficient way of looking at their division of responsibility. There's no oversight in the spirit, as indicated in the decision. So that case liability is still proper, as noted in the summary judgment by the lower court. I believe that judicial estoppel is very – is not applicable here. Very clear cut. In this case, we had two different – we don't have two different positions. We only have one position. SIH has maintained the same facts. You do have two different jurisdictions here. You have the federal court and then you have the state court. Was evidence put on at trial there for Mr. Mosley? It was. It was from the United States. Information did come from SIH, but SIH did not participate, as indicated inside of the – in some of the briefs and some of the other documents. They did not participate in actual sentencing. They were there. The sentencing was by the United States. Judge Ankle did not ask SIH for their recommendation. Everything came from the United States and its representatives. So that is tossed out. So when you look at all five areas of judicial estoppel, interconnected by the word in, you have to leave all of those. None of those apply. Excuse me, the same position, same facts, so judicial estoppel fails. The same thing with collateral estoppel. Now, there are three factors, Jeremy, by the Supreme Court for estoppel of this type, which is called a non-mutual defensive collateral estoppel, and I thought Judge Simpson explained it very well in her order. What we're trying to do is QED is trying to prevent SIH from coming after them for this loss because Mosley was found guilty. But what was he found guilty for? Mail fraud and wire fraud. Those are not the same things in here. This case is about breach of contract, both in Carbondale and at the Marine facilities for SIH. It's about the response to the voluntary statement. As I said earlier, you have to have knowledge, and you can overcome knowledge by the actions of the person committing the fraud. And here we have Mr. Mosley. Mr. Mosley was acting outside the bounds of being a responsible member of SIH's management group. He was the one receiving these invoices. He was purposely changing these invoices and then putting them back on a hat as the director of radiology going, I have verified these. Go ahead and pay them. SIH did not have knowledge that these were frauds. And that's because Mr. Mosley was acting outside of his role as a responsible member of SIH. He was committing fraud. He's lining his own pockets the entire time. So he's abandoning responsibility for any duties to SIH by his actions. And, again, he's going with TBD. Also, as far as I talked about the mitigation damages, SIH did not have to take the funds that were offered. Those were negotiations to get that $378,000 that TBD was offering. But by the time the accounting was done, SIH realized they would be losing quite a bit of money, $800,000 in the transaction. This is prior to the conviction of Mr. Mosley. Because of that, SIH did try to minimize it, mitigate their damages. That was part of the counterclaim against SIH for not paying certain bills because they were trying to mitigate their damages, to not pay QED for overpaying them, in that sense, for what was done. Do you have any other questions for me? Any questions? No questions. SIH will stand on its brief. Thank you for your time. All right. Thank you.  Counsel said this case brought by SIH is based on contract. All of these restitutionary claims are based on contract. The Supreme Court of McIntosh has said that any claim seeking restitution, as SIH is here, is barred by the voluntary payment doctrine if, on the demand, invoice, or receipt, the nature and amount of the charge is plainly stated. And they were clear, McIntosh v. Walgreens, was clear that you cannot escape through the fraud exception by saying, I didn't know about the fraud. There are cases cited in the brief where the applying Illinois law, and the federal courts have said, the federal district court in Chicago, said that the voluntary payment doctrine isn't triggered because you didn't know about the fraud during the time it happened. If the receipt, if the invoice gives you all the information you need to determine if they were being asked to pay more than 24 hours a week, the voluntary payment doctrine applies. Even though Mosley destroyed the statement of fees, that information is plainly on the invoice. Now, we talk about vicarious liability, which is also within the ambit of the voluntary payment doctrine. But here it fails. In the Horowitz case, Horowitz v. Holbrook, Newark, the Supreme Court, it said there has to be an agency relationship between the, in that case it was attorneys were representing a client. There was a clear agency relationship there. Here there is no agency relationship between QB and Mosley at SIH. He was never sent there. If a janitor works at a school and then after his employment is terminated, comes back with a key and robs the school, does that make his employer liable for that? That's what we have here. We have a federal prosecution that awarded restitution of $1.2 million against Mosley, of which SIH has already received tens of thousands of dollars from that restitution for the same amount based on the same facts and the same damages and the finding that Judge Angle said that Mosley was solely responsible for that loss. He argued during the restitution civil portion of that hearing that he should only be charged with restitution for the amount he received. The court rejected that. So what we have is a basic misunderstanding by the trial court as to what the fraud exception is. Trial court's order said there is no dispute that Mosley's actions were fraudulent. Indeed, Mosley admitted fraud, pled guilty to his conduct in a federal criminal case. The voluntary payment doctrine is inapplicable. That is a misstatement of the law. The voluntary payment doctrine provides for certainty in transactions. We're trying to claw back seven years of transactions based on what? They had an invoice that told them there was a breach of it. They were being demanded more than the contract provided for. It's plain. Even after he destroyed it, it's plain. They never looked at that. Not only that, Mosley got them to increase their budget to fund his fraud. The voluntary payment doctrine applies. This overly broad interpretation of any fraud means that it doesn't. It has been rejected by the Supreme Court. And additionally, when we talk about it, Judge, if I just for a second, we talk about they didn't pay back the $1.2 million. In the vicarious fraud case decided by the Supreme Court, the Howitz case, it states that if you have an agent who commits fraud and you find out about that fraud and you've benefited from that fraud unknowingly, if that's your agent and you don't repudiate the fraud by attempting to pay back the benefit you retained, then you have, in fact, ratified the fraud. One, he's not the agent. Two, it's the benefit they received. That's exactly what, without the advice of counsel, working was offered. I'm going to pay you back the margin that we kept after we paid Mosley when we shouldn't have paid. They tried to rescind and revoke any benefit they had. That would have taken them out of the vicarious fraud, even if there was an agency relationship. Thank you. Thank you. One final question. Yes, please. This case comes on as a motion for summary judgment on both parties. Correct. What relief are you asking for? Should we grant? I've asked that you reverse the summary judgments in favor of SIH on the three counts that were granted and that you amend this case with directions to enter the summary judgment in favor of QED. Thank you both for your arguments. We will take this matter under advisement and issue a ruling in due course. Thank you.